IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SIERRA D. WEAVER, as Administratrix<br>for the Estate of TRACIE P. WEAVER,<br><br>        Plaintiff,<br><br>v.<br><br>RICHARD STRINGER, Sheriff of<br>Washington County; ARTHUR RAY<br>BUSBY, Administrator of Washington<br>County Jail; Deputy TINA PARNELL;<br>Deputy EMIL DELAROSA, JR.; and<br>Deputy MICHAEL BLAINE BARNETT;<br>All sued in their individual capacities;<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:18-cv-00052-__-__<br><br><br><br><br>JURY DEMAND |

## COMPLAINT

1.      This is a civil action brought by the Plaintiff, Sierra D. Weaver, as Administratrix of the Estate of Tracie P. Weaver, a decedent denied certain constitutional rights by the Defendants while incarcerated in a jail facility.  This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12131, *et seq*., the Americans with Disabilities Act, 29 U.S.C. § 701, Section 504 of the Rehabilitation Act of 1973, and Alabama law to recover civil damages arising from violations which resulted in the death of Tracie P. Weaver, a pre-trial detainee at the

Washington County Jail operated by the Sheriff of Washington County. Specifically, the Defendants were deliberately indifferent to Ms. Weaver's serious medical needs during her detention in violation of her rights as a pretrial detainee under the Fourteenth Amendment to the U.S. Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973. Plaintiff also claims damages under Alabama's Wrongful Death statute.

## Jurisdiction and Venue

2.     This action arises under the Fourteenth Amendment to the U.S. Constitution, by and through 42 U.S.C. § 1983, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and Alabama law.  The Court has jurisdiction over the Federal matter pursuant to 28 U.S.C. § 1331 and 1343(a)(3). The Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3.     This judicial district is an appropriate venue under 29 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

## The Nature of the Action

4.     In mid-June, 2016, Tracie P. Weaver ("Tracie") was placed in the Washington County Jail.   Tracie suffered from a disability which was known to the

Washington County Sheriff's personnel.  Until June 20, 2016 Tracie was in the custody of the Sheriff pending trial or other disposition of charges brought against her.

5.     All of the acts and omissions of the defendants hereinbefore and hereinafter alleged were accomplished under color of state law.

## Parties

6.     Sierra D. Weaver (hereinafter "Sierra") is the duly appointed Administratrix of the Estate of Tracie P. Weaver (hereinafter "Tracie" or "the deceased").  The Estate of Tracie P. Weaver, through its Administratrix, is duly authorized to litigate matters on behalf of the deceased.

7.     Defendant Richard Stringer (hereinafter referred to as "Stringer" or the "Sheriff") is, and at all times pertinent to the claims made herein was, the Sheriff of Washington County, Alabama and the ultimate policymaker for the operation and management of the Washington County Jail (hereinafter referred to as the "Jail"). Stringer has a statutory duty under Alabama law to protect the safety and attend to the medical needs of detainees in the Jail.   Stringer is named as a defendant in his individual capacity only.

8.     Defendant Jail Administrator Arthur Ray Busby   (hereinafter referred to as "Busby") was at the times pertinent to the claims made herein the person whom

Sheriff Stringer designated and delegated the responsibility for supervising, monitoring and instructing the Jail staff personnel, and ensuring that the staff operated the Jail in accordance with the laws, standards, policies, and procedures applicable to the operations of the Jail, including without limitation, state and Federal law and the policies and procedure manual or the SOP manual for the Washington County Jail.   Busby is named in his individual capacity only.

9.     Upon information and belief, Defendants "Tina ("Parnell"),  Emil Delarosa, Jr. ("Delarosa"), and Blaine Barnett ("Barnett") were deputy sheriffs, correctional officers or other employees or agents of the Sheriff of Washington County, Alabama, and on duty at the Washington County Jail in June, 2016.   These defendants are named in their individual capacities only.

## Allegations Common to All Claims

10.    The Washington County Jail is administered by the Sheriff of Washington County, Alabama, Richard Stringer.  It houses an average of sixty to eighty inmates per day and is the detention Jail for not only Washington County, but for the towns of Chatom, Millry, and McIntosh, Alabama.   Upon information and belief it also houses detainees from jurisdiction in Mobile County, Alabama, under some undetermined arrangement. The Jail is located in the upper floor of the Sheriff's Department connected to the Washington County Courthouse.

4

11.    Normally, there is only one correctional officer on duty and his or her normal post is on another floor.   Day to day supervision or operational needs are carried out by Inmate Trustees.   The Sheriff neither employs, nor utilizes, medical staff for the treatment of the inmates.   There is no periodic medical monitoring or care for the inmates.   The Sheriff relies on the external medical providers, in particular, the Washington County Hospital located some miles from the Jail, for any medical emergencies encountered by jail inmates.

12.    The Jail is located in the rear of the Washington County Courthouse which was completed in 1965.   The Jail facility is outdated, overcrowded, and poses structural obstacles to the safe operation and provision of a healthy environment for the inmates, and in particular, those suffering from medical and mental disabilities.

13.    Not only is the Jail under staffed, but the correctional officers lack training to carry out their functions in a minimally safe manner.   The correctional officers' lack of sufficient knowledge of inmates' medical conditions give rise to the inmate's medical deterioration and death.

14.    In addition, upon information and belief, the policies of the Jail and the Sheriff, both formal and informal, are deliberately indifferent to serious medical conditions of the inmates.   Further, the policies, both formal and informal, create

delays in the identification and treatment of inmates with serious medical conditions.  These policies have caused the deterioration and/or death of inmates in the past and the Washington County Jail has a wide-spread history of medical emergencies, injuries, illnesses, and death caused by the Sheriff's policies, both formal and informal.

### Tracie P. Weaver's Incarceration and Death

15.    On June 13, 2016, Kylee Rivers, Tracie's 17 year old daughter, received a call from Demopolis Jail (334-295-2257) that they were transferring the deceased to the Washington County Jail.  Tracie was placed in the Washington County Jail on June 13, 2016.

16.    Tracie was placed in a four person cell in the women's section of the Jail.

17.    Tracie had recently been released from Brian Whitfield Memorial Hospital in Demopolis, Alabama, where she underwent 33 days for substance abuse. Subsequent to her release from Brian Whitfield, she stayed briefly in a rehabilitation facility or home.  She was returned to Washington County on a hold from that county's Circuit Court.

18.    From the point she began her stay in the Jail, fellow inmates who were familiar with her described her as physically and mentally weak and in distress.

She appeared underweight, ill, and unstable.

19.    Jail personnel, in particular Defendant Delarosa, failed to provide Tracie her necessary medication on a timely basis.

20.    Tracie was barely coherent.   She took small, shuffling steps when she tried to walk.   She complained to the other inmates she was not getting her medicine on time.   She suffered seizures and could barely talk.   She suffered debilitating headaches and she cried constantly.   One inmate described that she "wasn't in reality."   She could hardly eat on her own.   She was drooling constantly.

21.    On her second day in the Jail, Tracie was moved to an eight person women's cell.   Tracie could not adjust and was suffering panic attacks.   In the new cell, another inmate had her sleep on the bottom bunk because she was suffering seizures and might fall from the top bunk.   The inmate tried to help her eat, but Tracie kept complaining about headaches.

22.    Tracie and other inmates complained to Jailer Delarosa that Tracie was not getting her medication or not getting it on time.   Delarosa ignored her.

23.    During Tracie's stay at the Jail, a dispatcher for the Sheriff called Kylee and advised her that Tracie was throwing up and that her blood pressure was sky high.   The dispatcher stated that they were not sure why Tracie was sick.

24.    Kylee Rivers received another phone call on June 17, 2016, from

someone at the Washington County Jail (1-800-943-2189), advising her that Tracie was making threats to cut her wrists.

25.   On June 20, 2016, Tracie was suffering from headaches and otherwise so ill, that another inmate in the cell stayed up with Tracie all night because Tracie's head was hurting so badly.   Jail personnel, to include upon information and belief, the Defendants, had failed to bring Tracie her medication on the three times a week schedule as required.   The inmate knocked on the door to get medical help.   Tracie could not eat that morning, could not talk, and was incomprehensible.   Delarosa, advised Tracie not to bother him anymore.   He refused to provide Tracie's medication although it was time for her medication.

26.   When the inmate persisted on demanding that he give Tracie some assistance, Delarosa returned.   The inmate pointed out that Tracie's face was drawn up and appeared to be having a stroke.   Delarosa replied, "I am tired of your shit, Tracie.   You are worrying me.   I got stuff to do!"   Delarosa jerked Tracie by the arm and walked her to a solitary cell, referred to as "the Hole."   Tracie was placed in the Hole for approximately six hours.

27.   Inmates throughout the Jail, males and females, could hear Tracie screaming.   The inmates heard Tracie vomit until she dry heaved which went on for several minutes.   Tracie kicked on the door and begged for help.

8

28.    At one point, Delarosa opened the door and threatened Tracie.  He threatened to "knock the fuck out of her if she didn't shut up."   He said that if she "didn't shut up he was going to spray her with pepper spray" and then slammed the door in her face.

29.    The inmates heard Tracie continue to kick the door and ask for her medicines and a blanket.   Eventually she fell silent.

30.    At some point, Tracie was removed from the Hole and placed in a restraint chair where she was strapped down.   She was held in the restraint chair for approximately one hour.   Throughout her time in the Hole and the restraint chair, Tracie was crying and screaming out, "Help me, help me, help me…Somebody please help me."

31.    At approximately 6 o'clock during the shift change, Delarosa was replaced by Defendant Tina Parnell.   Parnell, who was normally a dispatcher, was totally unfamiliar with her work and apparently unfamiliar with her duties and responsibilities.

32.    Tina directed inmates Amanda Sullivan, Chris Williams, and Richard L. Lucious ("Bungee") to carry Tracie back into the Hole so Amanda Sullivan could change her clothes.   Sullivan found Tracie in the restraint chair in what she described as a "stroke mode."   Tracie was drawn up, and could only verbalize "uh,

9

uh." Tracie appeared to be dying and she was strapped in the chair. Tracie had vomit all over her clothes.

33.   According to Chris Williams, when she was removed from the Hole and placed in the restraint chair and placed in the restraint chair, she was unresponsive and was foaming at the mouth.

34.   Sullivan placed on gloves and, inside the Hole, changed Tracie's clothes to a different jail outfit.   After her clothes were changed, Tracie was carried back into the restraint chair.   She was still incoherent and showed signs of stroke or incapacity.   She was now turning blue around the mouth.   Her muscles were very tight.   She continued to moan.

35.   Parnell directed Sullivan and the other Trustees to strap Tracie back in the chair so she would not fall over.   Sullivan urged Parnell to call an ambulance because it appeared to Sullivan that Tracie was close to death.   Parnell, however, took no action for over twenty minutes.   Parnell advised Sullivan that the policies of the Jail, and in particular, the rules of Administrator Busby, is that no ambulance should be called under any circumstances without the direct permission of Busby, who could not be located.

36.   Sullivan provided Parnell with the contact information for Tracie's family members, who she called, but could not locate any family members to come

to the Jail.

37.    On June 20, 2016, a person identifying herself as "Dispatcher 3" from the Sheriff's office called Kylee and advised her that Tracie was throwing up. Dispatcher 3 advised Kylee that Kylee needed to come get Tracie and take her to the hospital.   Kylee advised Dispatcher 3 that she was only 17 years old and had no way to get to the Jail.   Kylee called a family friend, Brittany Weaver, and advised what happened.   Weaver called the Jail and spoke with the Dispatcher and inquired whether the Jail was simply going to allow Tracie to suffer in the Jail without medical care.   The Dispatcher stated that all ambulances were tied up and all deputies were unavailable.

38.    Finally, Parnell directed Sullivan and Chris Williams to carry Tracie to the elevator, which brought them down to the first floor, which is also the dispatch location for the Sheriff's Department.   At that point, a white, male Sheriff's deputy entered, who, upon information and belief, was Barnett.   Defendant Barnett was eating a hamburger and appeared unaffected by the situation he encountered.   He told Tracie, who was clearly incompetent, to sign a paper so she could be released to the hospital.   Tracie could only reply, "uh, uh."   Barnett replied to Tracie, sarcastically, "You can say, 'uh, uh' all you want, but if you don't sign this paper, you are not being released."

11

39.    Shocked, Sullivan expressed to Barnett the seriousness of the situation. Barnett kept eating his hamburger.   Upon information and belief, this whole incident was captured on a camera or video.

40.    Eventually, Tracie was placed in a Washington County Sheriff SUV where she was driven by Sheriff's personnel to the Washington County Hospital, in Chatom, Alabama.   The hospital is approximately one mile from the Jail.

41.    At approximately 8:13 p.m., Washington County Jail personnel called Sierra Weaver, Tracie's daughter, and stated that she needed to get to the hospital as her mother was there and unresponsive.   Sierra Weaver, Kylee Rivers, and a friend, Becky Thompson, drove straight to the hospital.   Sierra and Becky Thompson went inside the hospital and encountered a Caucasian Washington County Deputy. Sierra identified herself and the deputy began to tell her something and then stopped and advised her, "The doctor will tell you."

42.    Sierra and Thompson then spoke with a doctor who advised them that the hospital was attempting to get a "South Flight" helicopter from the University of South Alabama Medical Center (USAMC).   He stated that Tracie was unresponsive and in a coma. Sierra was allowed in to see Tracie and saw the hospital staff hand-pumping air into her.   The doctor advised Sierra, "There is a lot of bleeding on the brain."   The doctor advised the family that it was caused by a brain hemorrhage

12

or brain stroke; however, she still had a heartbeat at while at the Washington County Hospital.

43.    A South Flight helicopter arrived at the helipad in Chatom and an ambulance took Tracie to the helipad.   Tracie was then flown to USAMC.

44.    Sierra, Kylee, and Becky Thompson drove to USAMC.   They arrived after 10 p.m.   They met their aunt, Claudette Graves, from McIntosh, Hailey Rivers (Tracie's third daughter) and Brittany Weaver.   They were told the hospital was doing no more tests because they had scans from the Washington County Hospital. They were advised Tracie was still unresponsive and was in a self-induced coma. Sierra advised the USAMC personnel that Tracie had seizures but it was unknown if she was medicated.   The personnel advised the family that there were no drugs in Tracie's system at Washington County Hospital.   They had done a reflex test that had shown no response.

45.    The family returned home to Washington County at 8:30 a.m. after USAMC put Tracie in a room.

46.    At 2 p.m. on June 21, 2016, USAMC personnel ran a nuclear test (with dye) to the brain.   They found no brain function.   Sierra signed a Do Not Resuscitate order and on June 21, 2016, life support was removed.   Tracie died at 5:42 p.m., about fifteen minutes later.

## Evidence of Deliberate Indifference

47.     Washington County and Stringer have a history of litigation and complaints against them alleging instances of deliberate indifference to needed medical care by the inmates at Washington County Jail.

48.     Defendants' actions were done pursuant to a custom, policy or practice to deny medical care or treatment to inmates as reflected by its failure to provide medical staff on duty, or otherwise offer any competent medical services.

49.     Defendants were deliberately indifferent to Tracie's medical needs from the inception of his incarceration. Specifically, they:

  a.     Deliberately failed to provide access to any medical personnel in the jail.

  b.     Deliberately failed to give Tracie her medications.

  c.     Deliberately failed to monitor Tracie as needed.

  d.     Deliberately failed to respond to Tracie's obvious need for medical attention when she first began to exhibit signs of extreme distress that continued for over a two-three day period and eventually declined into a comatose state and death.

  e.     Deliberately failed to give Tracie medical attention while in an incompetent state.

14

50.     The failure of the jailers to treat Tracie was done pursuant to the customs, policies, and/or practices of the Sheriff of Washington County, Alabama, Richard Stringer.

51.     As a result of Defendants' deliberate indifference to Tracie's medical needs, Tracie was made sick, lapsed into a comatose state and ultimately died. Tracie's condition became critical and then fatal due to Defendant's deliberate indifference to Plaintiff's serious medical condition.

## CLAIMS

## COUNT I
### § 1983 Claims, Fourteenth Amendment Violations
### (All of the Individual Defendants)

52.     The Plaintiff realleges all of the allegations of the foregoing paragraphs and incorporates the same by reference herein.

53.      Upon information and belief, the individual defendants, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Tracie's serious mental health needs which required, among other things, assessment, classification, cell assignment, cell precautions, treatment, and monitoring, as further described *infra.* These defendants, despite knowledge of a serious medical need, did not take appropriate action and thereby deprived Tracie of her rights as a pretrial detainee under the Fourteenth Amendment

15

to the Constitution of the United States, in violation of 42 U.S.C. § 1983.

54.     The individual defendants either (a) participated in the pattern of neglect, mistreatment, and abuse of Tracie described hereinbefore, or (b) saw and/or knew of the neglect, mistreatment, and abuse of Tracie and failed to take reasonable steps to protect her from such neglect, mistreatment, and abuse.

55.     This conduct of the defendants was a proximate cause of Tracie's death.

56.     The Defendants' conduct was done with malice or reckless indifference to Tracie's Federally protected rights, giving rise to Plaintiff's entitlement to punitive damages.

## COUNT II
### § 1983 Claims, Fourteenth Amendment Violations
### (Stringer in his Individual Capacity)

57.     The Plaintiff realleges all of the allegations contained in the foregoing paragraphs and incorporates the same by reference herein.

58.     The Washington County Jail houses approximately 30 or more inmates on the "Mobile side" and approximately 30 or more inmates on the "Chatom side." Upon information and belief, the Jail, under contract with the County of Mobile, houses Mobile inmates as well as Washington County inmates.

59.     Normally, and especially at night, only one deputy is assigned to the Jail.  Almost all supervision, as well as staff responsibilities, are handled by 6-8 inmates who are designated Trustees.   The one staff deputy normally takes a position on another floor of the Jail and does no assigned rounds.

60.     For all intends and purposes, the Jail provides no medical treatment to the inmates.   There are no in-house nor contracted medical staff assigned to the Jail, no nurse on duty, and no physician doing normal, periodic sick call.

61.     The policy and procedure of the Jail is that should an inmate need medical attention, the inmate's family must make an appointment with a free-world doctor or hospital and then pay for the care.  In practice, inmates (particularly without financial wherewithal) will only receive medical treatment while housed in the Washington County Jail should they experience emergency or life threatening conditions, and the Jail staff transports them to the emergency room at the Washington County Hospital.   That treatment will only be provided if approved by the Jail Administrator (in this occasion, Busby).   Any care provided by the hospital, must be borne by the family immediately, and not by the Jail.

62.     In those situations where inmates do utilize the Washington County Hospital, the inmate will not be released by the Jail until those medical bills are paid and satisfied.

17

63.     This procedure and practice by the Sheriff and the Washington County Jail has been in effect since at least 1990.

64.     As a result, the Sheriff and former Sheriffs of Washington County have been subject to a number of lawsuits and actions resulting from deaths or medical emergencies suffered by inmates that have gone untreated due to the Sheriff and the Jail's practice, custom, and procedure.   The Sheriff is aware of the effects of this unconstitutional practice and has been deliberately indifferent to its results.   This custom, practice, or procedure was directly responsible for the death of Tracie Weaver.

65.     Upon information and belief, Stringer failed to properly staff, adequately hire, train, manage, supervise, instruct the Jail staff defendants giving rise to the damages described herein.   Stringer's failure constituted an un-Constitutional custom or practice.

66.     Upon information and belief, Stringer failed to operate the Jail in accordance with whatever Rules the Jail maintains., but rather, allowed, permitted, and/or tolerated the Jail staff defendants to disregard the Rules in certain critical areas, and allowed, permitted and/or tolerated the actual custom and practice of operating and managing Jail in these areas to differ from and violate the Rules.   In

so acting, Stringer thereby caused the Jail to be operated in a manner inconsistent with, and in violation of, the Fourteenth Amendment to the U.S. Constitution.

67.     Stringer had supervisor responsibility for the Jail.   He personally participated in the un-Constitutional conduct alleged herein and was further connected to such conduct.   Upon information and belief, he was aware of the history of wide-spread abuse and was on notice of the need to correct the alleged deprivation, yet failed to do so.    Alternatively, it was Stringer's customs or policies that resulted in the deliberate indifference to Tracie's Constitutional rights. Alternatively, Stringer directed the Defendants to act unlawfully, or knew that they would act unlawfully and failed to stop them from doing so.

68.     This conduct of Stringer's was a proximate cause of the death of Tracie.


## COUNT III

### § 1983 Claims, Fourteenth Amendment Violations
### (Ray Busby in His Individual Capacity)

69.     The Plaintiff realleges all of the allegations of the foregoing paragraphs and incorporates the same by reference herein.

70.     Busby had supervisor responsibility for the Jail.   He personally participated in the un-Constitutional conduct alleged herein and was further connected to such conduct.   Upon information and belief, he was aware of the

history of wide-spread abuse and was on notice of the need to correct the alleged deprivation, yet failed to do so.   Alternatively, it was Busby's customs or policies that resulted in the deliberate indifference to Tracie's Constitutional rights. Alternatively, Busby directed the Defendants to act unlawfully, or knew that they would act unlawfully and failed to stop them from doing so.

71.     This conduct of Busby was a proximate cause of the death of Tracie.

## COUNT IV
## Title II of Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq.
### (Against All Defendants)

72.     The Plaintiff realleges all of the allegations of the foregoing paragraphs and incorporates the same by reference herein.

73.     Tracie was a qualified individual with a disability as protected by the Americans with Disabilities Act.   In particular, Tracie had a physical and/or mental impairment that substantially limited one or more of her major life activities. Tracie also has a record of physical impairments that substantially limited those same major life activities.   Finally, the Defendants regarded Tracie as having had an impairment that substantially limited major life activities.

74.     Tracie was qualified to meet the essential eligibility requirements of services offered by Defendant Sheriff of Washington County, to include receiving

medical care and otherwise remain in custody without the fear of medical emergencies and deterioration.

75.    Defendants failed or refused to provide medical care.  Defendants' denial of medical care constituted a discriminatory denial of services and thereby violated the ADA.

76.    Tracie suffered damages to include loss of life as a result of the Defendant's discriminatory denial of medical services.

77.    Defendants' refusal to provide Tracie said medical services under the facts alleged *supra*, constitute a violation of Tracie's rights under the ADA and other federally protected rights, and Tracie died as a result.

**COUNT V**
**Violation of Section 504 of the Rehabilitation Act of 1973,**
**29 U.S.C. §701**
**(Against All Defendants)**

78.    The Plaintiff realleges all of the allegations of the foregoing paragraphs and incorporates the same by reference herein.

79.    Tracie was a qualified individual with a handicap as protected by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 701.   In particular, Tracie had a physical and/or mental impairment that substantially limited one or more of her major life activities.   Tracie also has a record of physical impairments

that substantially limited those same major life activities.   Finally, the Defendants regarded Tracie as having had an impairment that substantially limited major life activities.

80.    The Sheriff received Federal funding for the operation of the Washington County Sheriff's Department, and in particular the Washington County Jail, in such manner that the Sheriff is subject Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §701.

81.    Tracie was qualified to meet the essential eligibility requirements of services offered by Defendants, to include receiving medical care and otherwise remain in custody without the fear of medical emergencies and deterioration.

82.    Defendants failed or refused to provide medical care.   Defendants' denial of medical services constitutes a discriminatory denial of services and there thereby violates the Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §701.

83.    Tracie suffered damages to include loss of life as a result of the Defendant's discriminatory denial of medical services.

84.    Defendants' refusal to provide Tracie said medical services under the facts alleged *supra*, constitute a violation of Tracie's rights under Section 504 of the Rehabilitation Act of 1973 and other federally protected rights.

## COUNT VI
## Wrongful Death – State Law Claim
### (Busby, Delarosa, Barnett, and Parnell)

85.     The Plaintiff realleges all of the allegations contained in the foregoing paragraphs and incorporates the same by reference herein.

86.     The Plaintiff brings this count pursuant to Ala. Code (1975) § 6-5-410 and the Alabama Wrongful Death Statute against all defendants.

87.     The Defendants, Busby, Delarosa, Barnett, and Parnell, owed a duty of care to Tracie to protect her from harm and injury while in their custodial care.   Said Defendants breached that duty and negligently permitted Tracie to suffer from inadequate care while in their custody.   As a result of the said defendants' negligence, Tracie suffered injury, pain and suffering, and eventually death.

## RELIEF SOUGHT

As relief, the Plaintiff seeks the following:

a)      That she be awarded against the individual Defendants such damages as a jury shall determine from the evidence she is entitled to recover;

b)      That she be awarded prejudgment and post judgment interest at the highest rates allowed by law;

c)      That she be awarded the costs of this action, reasonable attorneys' fees, and reasonable expert witness fees; and

d)      That she be awarded such other and further relief to which she is justly entitled.

23

Dated:   February 2, 2018                    Respectfully submitted,


                                             */s/Henry Brewster*
                                             Henry Brewster (BREWH7737)
                                             HENRY BREWSTER, LLC
                                             205 N. Conception Street
                                             Mobile, Alabama 36633-1051
                                             Telephone: (251) 338-0630
                                             Facsimile: (251) 338-0632
                                             E-mail: hbrewster@brewsterlaw.net

                                             S. Joshua Briskman
                                             Briskman & Binion, P.C.
                                             Post Office Box 43
                                             Mobile, Alabama 36601-0043
                                             Telephone: (251) 433-7600
                                             Facsimile: (251) 433-4485
                                             Email:   jbriskman@briskman-binion.com

                                             *Attorneys for the Plaintiff*


## PLAINTIFF REQUESTS A TRIAL BY JURY
## OF ALL ISSUES TRIABLE BY A JURY

                                             */s/Henry Brewster*
                                             Henry Brewster


Defendants May Be Served At:

Washington County Sheriff
45 Court Street
Chatom, AL 36518